## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

**CHARLES MAUTI**

**V.**

**CA 2008-____**

JOHN SCUNCIO, individually and as Chief of Police
for the Town of Hopkinton; CHRISTOPHER LYMAN,
individually and as a police officer for the Town
of Hopkinton; MICHAEL GILMAN, individually and
as a police officer for the Town of Hopkinton;
DANIEL BARUTI, individually and as a police officer
for the Town of Hopkinton; WILLIAM DILIBERO,
individually and in his capacity as Town Manager
for the Town of Hopkinton; JAMES LATHROP,
in his capacity as Finance Director for the Town of
Hopkinton; John Does 1 through 10; Jane Does 1
through 10

**JURY TRIAL REQUESTED**

CA 08 54S

### COMPLAINT

### Jurisdictional Statement

The claims in Counts 1 through 3 are brought under Title 42, section 1983 of the United
States Code, and present federal questions within the jurisdiction granted to this Court by
Title 28, section 1331. The Court may exercise pendent jurisdiction over the state law
claims asserted in Counts 4 through 6.

### Parties

1. Charles Mauti is a resident of Westerly, Rhode Island.

2. From November, 1998 through January 19, 2007, Mr. Mauti was employed by the
   Town of Hopkinton, Rhode Island as its Building and Zoning Official.

3. Defendant John Scuncio is a resident of the Town of Exeter, Rhode Island.

4. Defendant Christopher Lyman is a resident of Westerly, Rhode Island.

5. Defendant Michael Gilman is a resident of Hopkinton, Rhode Island.

6. Defendant Daniel Baruti is a resident of Narragansett, Rhode Island.

7. At all times pertinent to this Complaint, Defendant Scuncio was employed by the Town of Hopkinton as its Police Chief, and Defendants Lyman, Gilman and Baruti were employed by the Town of Hopkinton as police officers. Scuncio, Lyman, Gilman and Baruti are sometimes referred to collectively in this Complaint as the "Police Defendants."

8. Defendant William Dilibero is the Town Manager for the Town of Hopkinton and is named as a defendant individually and in his official capacity.

9. Defendant James Lathrop is the Finance Director for the Town of Hopkinton and is named as a defendant in his official capacity only.

10. Defendants John Doe 1 through John Doe 10 and Jane Doe 1 through Jane Doe 10 are individuals who participated in the actions complained of in this Complaint but whose identities are not presently known to Plaintiff.

## Factual Allegations Pertaining to All Counts

11. During Mr. Mauti's tenure as Hopkinton's Building and Zoning Official, the Town of Hopkinton built a new police station.

12. Mr. Mauti, along with several residents of the Town of Hopkinton, served on the Building Committee for the police station.

13. During the planning and construction of the police station, spending on the project was overseen by Hopkinton's Finance Board, which was made up of unpaid citizen volunteers.

14. One of the members of the Finance Board during this period was Gregory Pezza. Mr. Pezza was the Finance Board's representative on the police station Building Committee.

15. As a member of both the Finance Board and the police station Building Committee, Mr. Pezza was outspoken in his views about the cost of the proposed building for the police station.

16. In retaliation for Pezza's public criticism, Scuncio ran an inquiry concerning Pezza through the RILETS/NCIC criminal information database.

17. The NCIC database is maintained by the Federal Bureau of Investigation. Access by local departments to the NCIC database is provided by the Rhode Island State Police through the RILETS criminal information system.

18. The RILETS/NCIC inquiry conducted by Scuncio revealed that Pezza had been charged with writing bad checks in the early 1990s.

19. Scuncio disclosed the results of the RILETS/NCIC inquiry to the <u>Westerly Sun</u>, which published a series of articles about Pezza, widely publicizing the previous criminal charges.

20. Scuncio also disclosed the results of the RILETS/NCIC inquiry concerning Pezza during the public forum portion of a Hopkinton Town Council meeting, suggesting that Pezza was not fit to serve on the Finance Board.

21. Pezza stated publicly that Scuncio's actions were motivated by Pezza's scrutiny of the police department budget as a member of the Finance Board, stating: "He is out to get me. Basically I chewed him out last week at the budget meeting, and he went and did a background check on me."

22. As a result of Scuncio's public disclosure of information he obtained through the RILETS/NCIC database, Gregory Pezza resigned from the Finance Board and the police station Building Committee.

23. Accessing the RILETS/NCIC database for other than legitimate law-enforcement purposes is a felony under federal law.

24. On or about February 22, 2002, Mr. Mauti delivered to the Hopkinton Town Council a written memorandum accusing Scuncio of misusing the RILETS/NCIC database to obtain and publicly disclose information about Greg Pezza. A copy of the Memorandum Mr. Mauti sent to the Town Council is attached as Exhibit A.

25. The Town Council did nothing in response to Mr. Mauti's Memorandum.

26. During the construction of the police station, several issues arose which required Mr. Mauti's involvement in his capacity as the Town's Building and Zoning Official.

27. Early in 2003, Mr. Mauti notified the Town Council that while the proposed design for the police station was intended to accommodate up to sixty occupants, the individual sewage disposal system ("ISDS") that had been approved by the Department of Environmental Management ("DEM") restricted building occupancy to twenty. The designated site of the proposed station could not accommodate a larger ISDS because of its elevated water table.

28. Rather than pay to build a police station that could not legally be used to its full capacity when new, much less be expanded in later years, Mr. Mauti recommended in writing that the Town find an alternative site that could accommodate a larger ISDS.

29. Mr. Mauti's position was confirmed in a subsequent conference call between DEM, Mr. Mauti, and Hopkinton's Town Solicitor, Margaret Steele.

30. The Town nevertheless proceeded with construction of the police station on the original site without any material change in the building's design.

31. In January, 2004, after the last of a series of "final" inspections prior to issuance of a Certificate of Use and Occupancy ("CO") for the police station, Mr. Mauti discovered that a salt-based water-softening system had been installed in the building during the previous month.

32. Mr. Mauti notified the Town Manager that the water-softening system had been installed incorrectly, without required permits, and without any inspections having been requested or conducted. He also observed that such system could adversely affect the functioning of the already insufficient septic system.

33. Mr. Mauti's warnings were again disregarded. Instead, less than two weeks after his last inspection of the building, Mr. Mauti was directed by Robert Corrigan (a member of the Hopkinton Town Council) to issue a CO for the police station.

34. In response to Mr. Corrigan's directive, Mr. Mauti issued a CO for the police station which, in keeping with the DEM ISDS approval, expressly limits occupancy of the building to twenty persons.

35. On information and belief, the Hopkinton police station has been operated in violation of its legal occupancy limit beginning with the opening ceremony in 2004 and numerous times since.

36. Beginning early in 2005 and continuing through the date of Mr. Mauti's termination in January, 2007, the Police Defendants, under the direction of Scuncio, engaged in a campaign of intimidation and harassment directed at Mr. Mauti in retaliation for his public criticism of Scuncio over the incident involving Gregory Pezza and the issues Mr. Mauti had raised concerning construction of the new police station.

37. The public part of the campaign began with the issuance of a "verbal citation" to Mr. Mauti for storing five box trailers on property located on Laurel Street in Hopkinton. Mr. Mauti's wife, Patricia Pezzullo, had purchased the property the previous summer through a limited liability company that she owned.

38. Mr. Mauti had moved the trailers to the Laurel Street property in December of 2004, intending to move the contents into the building on the property. Heavy snow had delayed that process, and the trailers were still there in early February.

39. The police report on the incident regarding the trailers was prepared on February 3, 2005, modified by Scuncio, and then faxed from the Hopkinton Police Department to the Westerly Sun the next day. Two days later the Westerly Sun published a front page article (the first of many) under the banner headline "Building chief may face zone violation."

4

40. Within a few days of the <u>Westerly Sun</u> article, Detective Kevin McDonald, acting on Scuncio's instruction, obtained and executed a facially defective search warrant ostensibly intended to determine ownership of the trailers parked on the Laurel Street property.

41. At the time he applied for the warrant, McDonald already knew that Mr. Mauti owned the trailers, because Mr. Mauti had told McDonald so months before, in connection with an unrelated investigation of the towing company in Westerly where the trailers were being stored.

42. Mr. Mauti's ownership of the trailers was also recorded in a Hopkinton police report prepared by Officer Glenn Ahern, which was available to McDonald at the time he applied for the search warrant application.

43. McDonald nevertheless sought a warrant that was directed to Parity Properties, LLC, a company owned by Mr. Mauti's wife Patricia Pezzullo. Parity Properties was the owner of the Laurel Street property, but did not own the trailers.

44. When he served the search warrant on George Comolli, the registered agent for Parity Properties, McDonald apologized for doing so.

45. McDonald explained that Scuncio had ordered him to obtain and serve the search warrant, and told McDonald that he (Scuncio) had received a tip that the trailers were stolen.

46. In connection with the investigation, so called, of the Laurel Street property, McDonald sought to obtain a statement from Timothy Tefft, one of the people who had at one time expressed an interest in purchasing the Laurel Street property before its sale to Parity Properties, and who had discussed the property with Mr. Mauti.

47. When Mr. Tefft expressed reluctance to get involved, telling McDonald that he was not hurt by what happened, McDonald threatened to subpoena him, despite the fact that there was no pending proceeding in which a subpoena could have been issued.

48. On February 22, 2005, the <u>Westerly Sun</u> published a front-page article with the headline "Hopkinton Police Join Probe of Zoning Chief."

49. In late February, 2005, Defendant Lyman and Officer Patton went to the Building and Zoning Office and removed several of the property files maintained by that office for use of the public. Mr. Mauti and the office secretary were in the office at the time.

50. Lyman refused Mr. Mauti's request to allow his secretary to make a copy of the files so that the Building and Zoning Office records could be maintained complete.

51. On March 2, 2005, Mr. Mauti notified the Town Council, the Town Manager and Town Solicitor in writing of the seizure of files, and protested their removal without copies being left.

52. On or about March 5, 2005, as a result of the accumulated stress of the events recounted above, Mr. Mauti was hospitalized and spent several days in the intensive care unit at Westerly Hospital, before being transferred to and undergoing a coronary catheterization procedure at Miriam Hospital.

53. Mr. Mauti's hospitalization was the direct result of the stress and anxiety caused by the actions of the defendants.

54. One of the files taken from the Building and Zoning Office was for property that had previously been owned by Jill Matson, who had formerly served as President of the Town Council.

55. After the files had been removed, and were no longer available to Mr. Mauti or the public since they were in possession of the Police Defendants, the Westerly Sun published several articles concerning, among other things, the property Jill Matson had owned.

56. Those articles, which were based in part on information "leaked" by the Police Defendants, accused Mr. Mauti of having improperly issued a building permit to Jill Matson, suggesting he had done so to curry favor with her given her position on the Town Council.

57. In fact, the building permit in question was not only issued properly, but was not even issued to Jill Matson. It was issued to the subsequent owner.

58. After the articles concerning Jill Matson's property appeared in the Westerly Sun, John Matson, Jr. went to see Defendant Scuncio.

59. During a meeting with Scuncio at the police station, Mr. Matson complained to Scuncio that Scuncio's comments and the Westerly Sun articles were unfair to his sister Jill.

60. Scuncio told Mr. Matson that he was "not after your [Mr. Matson's] family; I'm after that son-of-a-bitch across the street," which Mr. Matson understood as a reference to Mr. Mauti.

61. On April 13, 2005, the Westerly Sun published an article which quoted portions of Mr. Mauti's April 3, 2005 memorandum to the Town Council, including Mr. Mauti's statement that the police department had been selectively targeting him and others who had been critical of Scuncio.

62. On or about April 14, 2005, Defendant Baruti called George Comolli, a lawyer who had represented Mr. Mauti and who, as the registered agent for Parity Properties, had been served with the search warrant by Detective McDonald in February.

63. Baruti asked Mr. Comolli what it would take for Mr. Mauti to "bury the hatchet" with Defendant Scuncio.

64. Mr. Mauti's response was that Scuncio had already gone too far to consider the suggestion.

65. In late April, Mr. Mauti wrote a Memorandum to the Hopkinton Town Council concerning numerous zoning violations by Scuncio on his property in Exeter. With his memorandum, Mr. Mauti provided documentation of Scuncio's failure to obtain required permits for several renovations to his residence.

66. In between March and May 26, 2005, Defendant Baruti conducted an inquiry concerning Mr. Mauti through the RILETS/NCIC system.

67. Baruti discovered that Mr. Mauti had an active Arizona drivers license, but no Rhode Island license.

68. In a report modified on May 5, 2005, Lyman stated that according to records from RILETS, Mr. Mauti possessed an Arizona license and was in violation of R.I.G.L. 31-10-1. It is not clear from Lyman's report whether he was referring to the RILETS/NCIC inquiry conducted by Baruti, or whether Lyman conducted another RILETS/NCIC inquiry himself.

69. Scuncio was informed of the results of the RILETS/NCIC inquiry or inquiries concerning Mr. Mauti.

70. Scuncio ordered Detective McDonald to arrest Mr. Mauti.

71. Detective McDonald refused to arrest Mr. Mauti.

72. On May 9, 2005, at approximately 3:00 a.m., Defendants Scuncio and Gilman met with Captain Lauren Matarese of the Westerly Police Department.

73. Prior to or at this meeting, Scuncio asked Matarese to arrest Mr. Mauti.

74. Either Scuncio or another of the Police Defendants at Scuncio's direction provided Matarese with the information obtained by Baruti and/or Lyman that Mr. Mauti did not have a Rhode Island drivers license.

75. Matarese agreed to arrest Mr. Mauti.

76. At approximately 1:30 p.m. on May 9, 2005, someone other than the dispatchers on duty used one of the secure RILETS/NCIC terminals in the dispatch room at the Westerly police station to run a RILETS/NCIC inquiry on Mr. Mauti.

77. According to Westerly Police Department records, there was no investigation underway concerning Mr. Mauti at the time this RILETS/NCIC inquiry was conducted, and the Department has stated it is unable to determine who ran the inquiry.

78. On May 10, 2005, acting at the request of and in concert with Scuncio and Gilman, Matarese stopped Mr. Mauti while he was on his way to work in Hopkinton and subjected him to a full custodial arrest, charging him with the violation noted in Lyman's May 5 report -- RIGL § 31-10-1, which requires Rhode Island residents to obtain a Rhode Island drivers license within thirty days of moving to the state.

79. Violation of RIGL § 31-10-1 is not a criminal offense. It is classified as a civil violation.

80. Before Mr. Mauti had finished the booking process at the Westerly police station, Matarese was informed by Corporal David Lachapelle, the shift supervisor, that violation of RIGL § 31-10-1 was not an arrestable offense.

81. Matarese nevertheless continued the booking process, and filed a criminal complaint in Rhode Island District Court charging Mr. Mauti with a misdemeanor.

82. Within two hours after arresting Mr. Mauti, Matarese called Scuncio to inform him that she had done so.

83. Mr. Mauti's arrest resulted in yet another round of publicity spearheaded by the Westerly Sun, culminating in an editorial on May 22, 2005, demanding that Mr. Mauti be fired.

84. The criminal case against Mr. Mauti filed by Matarese was dismissed on May 27, 2005, and the records of his arrest were ordered to be destroyed.

85. At some time later in May of 2005, Defendant Lyman presented a package of materials reflecting the "investigation," so called, of Mr. Mauti to the Rhode Island Attorney General's office.

86. In that package Lyman theorized that there was possible criminal liability on Mr. Mauti's part for various felony offenses, a suggestion that was promptly rejected by the Attorney General's office.

87. Lyman was advised "very early in [the Attorney General's] review" process that "there was no evidence to support any of these felony charges."

8

88. Despite being notified sometime in mid-2005 that there was no basis for any felony charges, Scuncio and Lyman concealed that information and instead encouraged the false public perception, published repeatedly in the <u>Westerly Sun</u>, that Mr. Mauti remained the subject of a felony investigation by the Attorney General's office during the balance of 2005 and well into 2006.

89. In fact, as Scuncio and Lyman knew, the only matter being considered by the Attorney General's office during the latter part of 2005 and first half of 2006 was a potential misdemeanor ethics violation.

90. At the time of these events, the Attorney General's office followed a policy of deferring to the municipality involved the decision whether to prosecute such misdemeanor ethics violations.

91. After being notified that there was no basis for a felony prosecution, Scuncio asked the Attorney General's office to continue its review with respect to the possible ethics violation despite the above-stated policy.

92. Scuncio did so in order to avoid having his "investigation" of Mr. Mauti pronounced baseless within weeks of referring it to the Attorney General's office, and in order to maintain what he knew to be the false public perception that there was a continuing felony investigation of Mr. Mauti by the Attorney General's office.

93. On or about July 3, 2006, Scuncio received a letter from William Ferland, Deputy Chief of the Criminal Division in the Attorney General's office, informing Scuncio that the Attorney General also declined to pursue misdemeanor charges against Mr. Mauti and stating that the matter was closed.

94. Instead of announcing this result, Scuncio requested a meeting with the Attorney General's office, which did not take place until July 28, 2005. That meeting did not change the result of the Attorney General's review, but it did result in another month of uncertainty, stress and anxiety on the part of Mr. Mauti.

95. Following the appointment of Defendant Dilibero as Town Manager in June, 2006, Scuncio provided to Dilibero several of the files that had been removed from the Building and Zoning office early in 2005, as well as additional material collected by one or more of the Police Defendants.

96. On the basis of the information provided to him by Scuncio, and without speaking with Mr. Mauti, Dilibero sent to Mr. Mauti a written reprimand for what he called "Inappropriate Conduct."

97. At the time Scuncio provided the information to Dilibero, Scuncio knew or should have known that certain of the information provided was false or misleading in material respects.

98. Scuncio nevertheless provided the information to Dilibero in order to induce Dilibero to take adverse employment actions against Mr. Mauti, in retaliation for Mr. Mauti's criticism of Scuncio and his actions as Building and Zoning official concerning the police station.

99. In reliance on the information provided by Scuncio, Dilibero took disciplinary action against Mr. Mauti.

100.   Dilibero took such disciplinary action against Mr. Mauti even after Dilibero had learned that certain of the accusations he made against Mr. Mauti based on information provided by Scuncio were false.

101.   In their actions recounted above, the defendants acted under color of law.

102.   The actions of the  Police Defendants against Mr. Mauti were not an isolated incident, but were rather part of a pattern and practice of Scuncio and other members of the Hopkinton Police Department misusing their authority in order to punish or discourage any criticism of Scuncio or the Department.

103.   The failure of Hopkinton's Town Manager and Town Council to put a stop to Scuncio's retaliatory actions, despite repeated written complaints by Mr. Mauti, constituted acquiescence in and ratification of Scuncio's actions and of the actions of the other Police Defendants.

104.   The failure of the Town Manager and Town Council to take any action against Scuncio or to protect Mr. Mauti was part of a pattern and practice of Town officials to fail to respond to complaints of Scuncio's misuse of his authority.

105.   Mr. Mauti was injured by the actions of the defendants, suffering severe stress, anxiety, and public humiliation, and incurring substantial financial loss by reason of the improper "investigation," his illegal arrest by Lauren Matarese, and ultimately by the termination of his employment by the Town  of Hopkinton.

106.   The actions of the Defendants violated section 1983 of Title 42 of the United States Code.

107.   In the actions recounted above, the Defendants acted willfully and maliciously, with the intent to injure Mr. Mauti, or with reckless and callous disregard of Mr. Mauti's rights.

### COUNT 1
### 42 U.S.C. § 1983
### U.S. CONST. AMENDMENT 1

108. The statements made by Mr. Mauti about Scuncio's misuse of the RILETS/NCIC system to publicly humiliate Gregory Pezza were made by Mr. Mauti as a citizen upon matters of public concern.

109. The statements made by Mr. Mauti about Scuncio's failure to comply with the Exeter zoning ordinance were made by Mr. Mauti as a citizen upon matters of public concern.

110. As such, Mr. Mauti's statements on both topics were protected speech under the first amendment to the United States Constitution.

111. The actions of the Police Defendants were taken in retaliation for Mr. Mauti's exercise of his rights under the first amendment.

112. The actions of the Defendants violated section 1983 of Title 42 of the United States Code.

113. Mr. Mauti was injured by the actions of the defendants, suffering severe stress, anxiety, and public humiliation, and incurring substantial financial loss.

114. Wherefore, Plaintiff seeks judgment against the Defendants for compensatory and punitive damages according to proof at trial, as well as costs and attorneys fees under section 1988 of Title 42.

## COUNT 2
## 42 U.S.C. § 1983
### U.S. CONST. AMENDMENT 4

115. Mr. Mauti's arrest by Lauren Matarese on May 10, 2005, violated Mr. Mauti's rights to be free of unreasonable search or seizure under the fourth amendment to the United States Constitution.

116. Matarese acted at the request of and in concert with Defendants Scuncio and Gilman, and on the basis of information they provided.

117. Mr. Mauti was injured by the actions of the defendants, suffering severe stress, anxiety, and public humiliation, and incurring substantial financial loss by reason of the wrongful arrest.

118. The actions of the Defendants violated section 1983 of Title 42 of the United States Code.

119. Mr. Mauti was injured by the actions of the defendants, suffering severe stress, anxiety, and public humiliation, and incurring substantial financial loss.

120.   Wherefore, Plaintiff seeks judgment against the Defendants for compensatory and punitive damages according to proof at trial, as well as costs and attorneys fees under section 1988 of Title 42.

## COUNT 3
## 42 U.S.C. § 1983
## U.S. CONST. AMENDMENT 4

121.   The actions of the Defendants violated Mr. Mauti's right to substantive due process under the fourteenth amendment to the United States Constitution.

122.   Mr. Mauti was injured by the actions of the defendants, suffering severe stress, anxiety, and public humiliation, and incurring substantial financial loss.

123.   Wherefore, Plaintiff seeks judgment against the Defendants for compensatory and punitive damages according to proof at trial, as well as costs and attorneys fees under section 1988 of Title 42.

## COUNT 4
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

124.   The actions of the Defendants were intended to and did cause severe emotional distress to Mr. Mauti.

125.   Mr. Mauti was injured by the actions of the defendants, suffering severe stress, anxiety, and public humiliation, and incurring substantial financial loss.

126.   Wherefore, Plaintiff seeks judgment against the Defendants for compensatory and punitive damages according to proof at trial, as well as costs and attorneys fees as allowed by law.

## COUNT 5
## Civil Conspiracy
## [Westerly Arrest]

127.   The actions of Scuncio and Gilman, in concert with Lauren Matarese, constituted a civil conspiracy, the object of which was the wrongful arrest and subsequent malicious prosecution of Mr. Mauti for violation of RIGL § 31-10-1.

128.   Mr. Mauti was injured by the actions of the defendants, suffering severe stress, anxiety, and public humiliation, and incurring substantial financial loss.

129.    Wherefore, Plaintiff seeks judgment against the Defendants for compensatory and punitive damages according to proof at trial, as well as costs and attorneys fees as allowed by law.


## COUNT 6
### Rhode Island Whistleblower Act, R.I.G.L. § 28-50-3

130.    The actions of the defendants constitute discrimination against Mr. Mauti in the terms, conditions, and privileges of his employment within the meaning of the Rhode Island Whistleblower's Protection Act, R.I.G.L. § 28-50-3.

131.    Mr. Mauti was injured by the actions of the defendants, suffering severe stress, anxiety, and public humiliation, and incurring substantial financial loss.

132.    Wherefore, Plaintiff seeks judgment against the Defendants for compensatory and punitive damages according to proof at trial, as well as costs and attorneys fees as allowed by law.


**PLAINTIFF DEMANDS A TRIAL BY JURY.**


Charles Mauti,
By his Attorneys


2/15/08

John Gyorgy 3560
Noel & Gyorgy LLP
50 South Main Street
Providence RI 02903
(401) 272-7400
(401) 621-5688 (Fax)
JPGyorgy@LawNoel.com