UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CHARLES MAUTI                :
                             :
   v.                        :   CA NO. 2008-54S
                             :
JOHN SCUNCIO, ET AL.         :

PLAINTIFF CHARLES MAUTI'S MEMORANDUM IN RESPONSE TO
DEFENDANTS' DISCOVERY STATUS REPORT

This Court's November 13th Status Report Order posed two simple questions:

> The Status Report shall [1] *detail Defendants' efforts to search their computer equipment* for documents/electronically stored information responsive to Plaintiff's discovery requests and [2] shall *identify the documents/electronically stored information produced to Plaintiff* as a result of such efforts.

(emphasis added). The short answers are 1) Almost nothing has been done; 2) Absolutely nothing has been provided to Plaintiff. Before the Court issued its recent Order – which came over a month after Plaintiff's Memorandum proposing search terms, and more than two months after the September 9th hearing at which the Court exhorted defense counsel to "start somewhere" – there was no indication that the Defendants intended to do anything at all.

Between issuance of the Order on November 13th and the "Amended" Status Report of November 24th, Defendants' outside computer consultant managed to slap together a report the gist of which does not require one to read past its first sentence:

> ♦ This is a very early stage of the forensic search process and there are no findings or notable observations at this juncture. The examination/search process is ongoing.

1

Roughly (but fairly) translated, Mr. Gross states that he has barely started, and at present has nothing of any significance to say. While his candor is refreshing – he is obviously unwilling to risk *his* credibility by making the kind of unsupported statements that comprise the bulk of defense counsels' Status Report – when the quoted statement is considered in the context of the twenty-two months since this action was filed and the seven and a half months the Plaintiff's Motion to Compel has been pending without resolution, the admission that nothing has been done by itself makes a strong case not only for an Order granting Plaintiff's Motion to Compel in its entirety without further delay, but also for an Order to Show Cause why the Defendants and/or their counsel should not be found in violation of Rule 37 and/or 28 U.S.C. § 1927.

Each of the lawyers who signed the Defendant's Status Report knows the significance of a showing of a pattern or practice of illegal behavior on the part of the Defendants. But they continue the pretense that the retaliation of the Police Defendants against former Town Council Member John Matson, his daughter Jill (former Council President), Marilyn Sheldon, and others, is irrelevant to the Plaintiff's claims. On this occasion they do not say so directly, but their Status Report offers no other reason for excluding every search term related in any way to the retaliation against Mrs. Sheldon, the Matson family, Brian and Lyd Nugent, Ken Young, Tyrell Rhodes, and other critics of the Police Defendants or defenders of Mr. Mauti.

Other search terms included in Plaintiff's October 9th Memorandum but omitted from Defendants' list are simply ignored, apparently in the hope that they will be lost in the technical cacophony. Records reflecting the nature and purpose of contacts by the Defendants with Mr. Mauti's ex-wife in Arizona or his estranged sister – and records showing what the Defendants did with that information – are but one example. Some was shared with The Westerly Sun, abnd some was apparently shared with Lauren Matarese, the Westerly police captain who arrested Mr.

2

Mauti in May of 2005 for a civil traffic infraction. After Marilyn Sheldon praised Mr. Mauti on her public access television program for assisting her with safety issues at the house she rented, Matarese paid a personal visit to Sheldon's Hopkinton home during which she attempted to convince Mrs. Sheldon that Mr. Mauti was not such a nice guy. Around the same time as Matarese's personal visit Mrs. Sheldon received two anonymous letters mailed from Providence which, among other things, accused Mr. Mauti of murdering his mother.

Period relevant to case is 2005 through "early 2007." DSR at __. In fact, Scuncio was targeting Mr. Mauti as early as February of 2002, when he ran an illegal NCIC search on him at the same time as the one on Greg Pezza. Defense counsel are just as wrong at the other end of the temporal spectrum: It was not early but *late* in 2007 – September to be precise – that Defendant Scuncio attempted to enlist the State Police in a criminal prosecution of Mr. Mauti for allegedly making false claims for mileage reimbursement to the tune of approximately $___. The only reason this second unsuccessful attempt came to light was its mention in one of the three email messages the Attorney General's office finally produced in June. Exh __ (AG Email). Despite its undeniable relevance, the Defendants have never produced a single record pertaining to it. That does not mean it did not happen.

Finally, Defense counsel again resort to the tactic first used seven months ago to deflect attention from their failure to provide the most basic discovery in this case – it must all be the fault of Plaintiff's counsel. The sins recounted run the gamut – from filing the Plaintiff's October 9th Supplemental Memorandum in violation of the Local Rules (DSR 11-23-09 at 1 n.1) to misstating the number of computer hard drives that the Defendants have finally managed to image (*Id*., at 1). Defense counsel are unconvinced by the explanation for the filing of the October Memorandum – that it was filed in response to the letter they faxed to the Court, which

3

would not otherwise have become part of the record in this case. As to stating in that Memorandum that four rather than five hard drives were proposed to be imaged, Plaintiff's counsel pleads guilty, but offers by way of mitigation that in the expert report filed on November 23rd as Exhibit B to the Defendants' Status Report, Mr. Gross made the identical error:

> ♦ All four computer devices were obtained on 9-29-09 and subsequently imaged to a forensic file format. This image is an identical forensic copy upon which all examination will be performed while preserving the integrity of the original media. The four devices are labeled as indicated below:

Defendants' Status Report 11-23-09, Exh. B, at 1. But Mr. Gross did not make a "misstatement," but simply "an error," according to the Defendants' "Supplement to Discovery Status Report" filed to correct the mistake the following day:

> ♦ All five (5) computer devices were obtained on 9-29-09 and subsequently imaged to a forensic file format. This image is an identical forensic copy upon which all examination will be performed while preserving the integrity of the original media. The five (5) devices are labeled as indicated below:

Defendants' Supplement to Discovery Status Report, Exh. B (Amended), at 1. Defense counsel took the opportunity presented by filing their "Supplement" to change not only the number of drives received by Mr. Gross on September 29th, but also the number of indexed folders and amount of raw data he more recently discovered they contained. *Id.*

But the question of whether it is four or five drives that have at last been copied (but *not* yet searched), Plaintiff asks that the Court take the time to review the Supplemental Memorandum filed on October 9th, the substance of which has been studiously ignored by Defense counsel. That Memorandum discussed at some length the difficulty of establishing either (1) the number of computers Hopkinton has had during the period relevant to this case, or (2) how many of those need to be searched in order to have confidence that a reasonably diligent

4

and complete search has been conducted. One thing is certain, however. The answer to both questions is many more than the five that defense counsel want to discuss.

Stymied in their effort to limit the search for electronic records by their inability or unwillingness to identify who used what equipment when, defense counsel simply ask the Court to assume without reason that only five out of more than sixty pieces of electronic equipment could possible contain material responsive to any of Plaintiff's seventy three document requests.

**No Credible Explanation is Offered For the Deletions By the Defendants From Plaintiff's List of Search Terms**

Without so much as a word of support or attempted justification from their own computer expert, defense counsel offer the following explanation for rejecting nearly two thirds of Plaintiff's list of search terms:

> The terms proposed by the plaintiff are *too numerous*, and many of the terms are common words (i.e. first names, "street", "trailers") and/or contain common character strings such as .com and .gov. The plaintiff's list also contained terms that were not relevant to the subject matter of this litigation.

DSR, at 1 (emphasis added). Bearing in mind that the time to object to any of the requests on grounds of undue burden or inaccessibility of data passed many months ago, defense counsel do not bother with an explanation of how numerous is "too numerous." That failure justifies, indeed requires, disregarding the argument. Similarly, defense counsel make no attempt to relate the

ever-present and ever-frivolous relevance objection to any of the substantial number of deleted search terms.[1]

Even a cursory look at what search terms defense counsel deleted makes clear that neither word-count nor relevance were important considerations. Indeed, the nature of the deletions from Plaintiff's list suggests the only interest being pursued is the concealment of relevant information from Plaintiff and the Court. A review of several of the specific terms excluded from the Defendants' list will illustrate the point.

One of the first items on Plaintiff's list was Charles Dippollino, the owner of Ashaway Cement Company, which sold the property on Laurel Street to Parity Properties, the company owned by Mr. Mauti's wife Patricia Pezzullo. Mr. Dippollino was one of the central figures in the so-called "investigation" of Mr. Mauti which began in early 2005. Plaintiff's list contains a number of alternative spellings of Mr. Dippollino's last name; the list is not the product of counsel's imagination, but is instead a collection of misspellings contained in Hopkinton police reports and/or Westerly Sun articles (many of which were based on Hopkinton police reports). There is no logical reason to include one variant but not the others; conversely, to have any assurance that relevant material is identified and retrieved, it is necessary to include *each* of them. The alternative spelling "Spasato" is included for the same reason.

A number of the items deleted by defense counsel not only cannot be explained by the few reasons offered for removing items, but are flatly inconsistent with statements by defense counsel about what should be included, or are so obviously necessary to any reasonably diligent

---

[1] Filed with this Memorandum as Exhibit A is a copy of Plaintiff's list of proposed search terms, previously filed as Appendix A to the October 9th Supplemental Memorandum. The terms highlighted in yellow on Exhibit A were deleted by Defendants.

search as to not be questioned. Some of these items are marked on Exhibit A with red highlighting:

- email addresses of Defendants Lyman and Baruti in addition to their official "hopkintonpolice.org" addresses;

- the name of Mr. Mauti's wife Patricia Pezzullo; see Complaint, ¶37-39

- Parity Properties, LLC, the company owned by Ms. Pezzullo and the purchaser of the Laurel Street property; see *id.;* ¶¶ 43-45

- The word "trailers," the storage of which on the Laurel Street property was the initial cause of the claims of conflict of interest;

- Gregory Pezza, whose public harassment by Scuncio in 2002 led to Mr. Mauti's memorandum to the Town Council about Scuncio's misuse of the RILETS/NCIC system; see Complaint, ¶¶ 14-25, 36

One of the more glaring deletions by defense counsel was the removal from the list of The Westerly Sun. The omission is all the more inexplicable given defense counsel's express acknowledgment – in the letter submitted as Exhibit A to the Defendants' Status Report – that notwithstanding their hopelessly crabbed conception of relevance, The Westerly Sun has to be included. Referring to the list of search terms proposed by Defendants, the letter states:

> The list contains terms that are likely to lead to the identification of relevant information. The issues raised in the motion to compel related to any communications with the Attorney General and the Westerly Sun concerning Mr. Mauti, and information concerning the investigations of Mr. Mauti. Therefore, the terms on the list relate to those issues.

Other deletions fit none of the reasons given by defense counsel; the only logical inference left is that deletion of the items is nothing more than an attempt to conceal information the relevance of which cannot credibly be questioned:

- Timothy Tefft; Mr. Tefft was one of several people who had expressed an interest in purchasing the Laurel Street property, but lost interest after talking with Mr. Mauti about the

7

restrictions on its use as a pre-existing non-conforming use in a residential zone. When Mr.Tefft rebuffed efforts by the Hopkinton police to convince him to complain about Mr. Mauti's conduct, Detective Kevin McDonald threatened to serve him with a subpoena to obtain a statement. There was no proceeding in which such process could have issued. Evidence that the Police Defendants were actively soliciting complaints against Mr. Mauti – to the point of bullying Town residents who were unreceptive, is clearly relevant. See Complaint, ¶¶ 46-47.

➢ Gerard Coyne: For some unexplained reason, defense counsel removed first and last names of a number of members of the Attorney General's staff, as well as personnel at The Westerly Sun, but left their email addresses. For Mr. Coyne and Mr. Devine, however, both their names *and* email addresses were removed. Coyne was the recipient of the several email messages disclosed by the Attorney General in June pursuant to the Court's Order, including one from Alan Goulart warning him that "Scungio *(sic)* is out of control and subjecting himself to a potential civil action by Mauti."

➢ Ethics Commission / Diane Leyden: The Police Defendants twice filed complaints against Mr. Mauti concerning Laurel Street with the Ethics Commission, and were rebuffed both times. The first occasion was in the spring of 2005 prior to their initiation of the Attorney General's criminal investigation of the same matter; the second occasion was in August of 2006, immediately after the Attorney General finally declined to take any action against Mr. Mauti. The latter complaints, signed by Defendant Lyman and Officer John Patton, and notarized by Scuncio, were returned by the Ethics Commission with a letter observing that the identical matter had been submitted to and rejected by the Commission a year previously. A separate complaint filed by Scuncio against John Matson met the same fate.

8

These few examples demonstrate the absence of any persuasive reason – much less an adequate legal basis this late in the game – for the latest attempt by the Defendants to delay further if not completely avoid compliance with basic and unquestioned requirements of the discovery rules. The attempt to do so by limiting the search terms is unsupported and contrary to positions previously taken by Defendants. The effort to do so by pretending – there is no other word for it – that the issue of electronically stored information pertains to only five hard drives, rather than to the more than sixty pieces of electronic equipment that we are *aware* of,[2] is sadly reminiscent of the Wizard's admonition to "pay no attention to that man behind the curtain."

Defense counsel have not taken issue with the argument presented in Plaintiff's October 9th Supplemental Memorandum, specifically the nature of the duty to identify and preserve relevant electronically stored material. Nor can they, given that the Federal Rules now codify the essential substance of the series of opinions issued in the *Zubulake* case and similar cases elsewhere. But without questioning the validity of or even acknowledging the *Zubulake*-derived standards, defense counsel behave quite as though they and their clients are immune from those requirements. How else to explain the flagrant disregard of the obligation to identify and preserve potentially relevant material, much less the failure to even review responsive material before objecting to its production, or deferring review of such material until several weeks after Motion to Compel has been filed and argued.

The conclusion to Plaintiff's October 9th Supplemental Memorandum bears repeating.

---

[2] The "IT Inventory" described by Melanie Benda-Joubert at her still incomplete deposition in February lists approximately fifty five pieces of equipment. In addition, the Defendants have failed to identify equipment used by the individual defendants such as home computers, laptops, PDAs, smart phones, or fax machines with sent/received memory capacity. This and related issues – conspicuously ignored by defense counsel – are discussed in Plaintiff's October Supplemental Memorandum.

**Conclusion**

This Memorandum is being filed just short of *[eight]* months after the April 15th discovery closure date. Plaintiff's Motion to Extend Discovery, filed on April 16th, has yet to be scheduled for hearing. The current situation in this case is similar to that which led Judge Scheindlin to make the following observation in *Zubulake*, which is equally applicable here:

> Here, as UBS points out, Zubulake's instant motion "comes more than a year after the Court's previously imposed March 3, 2003 discovery cutoff." Although UBS attempts to portray this fact as evidence that Zubulake is being overly litigious, it is in fact a testament to the time wasted by UBS's failure to timely produce all relevant and responsive information.

*Zubulake V*, 2004 U.S. Dist. LEXIS 13574, at 13 (citations and footnotes omitted). The efforts by defense counsel to deflect attention from their and their clients' failure to comply with the most basic discovery obligations by blaming the victim should no longer be tolerated.

Instead the Court should enter an Order requiring the Defendants to identify and to search all available electronic media for responsive records, and to produce that material to the Plaintiff forthwith. The Order should require as well that an inventory of all such equipment, including any equipment used by any of the individual defendants, or by any member of the police department. All such equipment should be searched using the terms listed on Exhibit A, and the search should include locating and where possible recovering deleted data.

                Respectfully submitted,

                      Charles Mauti
                      By his Attorneys,

                      /s/ John P. Gyorgy
                      John P. Gyorgy 3560
                      50 South Main Street
                      Providence RI 02903
                      (401) 272-7400
                      (401) 621-5688 (Fax)
                      JPGyorgy@LawNoel.com

## Certification

I hereby certify that on October 9, 2009, I sent a copy of the foregoing document to the following counsel of record, via the Court's ECF system:

William O'Gara
Pannone Lopes & Devereaux LLC
317 Iron Horse Way, St 301
Providence RI 02903
wogara@pld-law.com

Mark Reynolds
Reynolds DeMarco & Boland Ltd
146 Westminster Street
Providence RI 02903
mtreynolds@conversent.net

Melody Alger
Alger Parker LLP
95 Chestnut Street, Suite 401
Providence, RI 02903
malger@algerparker.com

/s/ John P. Gyorgy